IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DENNIS P.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 19-cv-837-RJD[2] |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM and ORDER**

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for DIB in April 2013, alleging a disability onset date of April 15, 2011. After holding an evidentiary hearing, an ALJ denied the application in August 2015. (Tr. 13-24). After the Appeals Council denied Plaintiff's request for review, he sought judicial review. The Court remanded the case pursuant to sentence four of 42 U.S.C. § 405(g). (Tr. 778-793).

The case was assigned to the same ALJ after remand. He held another evidentiary hearing and again denied the application in October 2018. (Tr. 692-706). The October 2018 decision is the final agency decision subject to judicial review. Plaintiff exhausted administrative remedies

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 13, 22.

and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ did not properly evaluate his subjective allegations.

2. The ALJ should have found that he had a severe mental impairment.

3. The residual functional capacity (RFC) assessment was not supported by substantial evidence because it was not based on a medical opinion, the ALJ did not explain how it was supported by the medical evidence, and the ALJ ignored Dr. Klug's psychological exam.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He was insured for DIB through December 31, 2016. The ALJ found that Plaintiff had severe impairments of bilateral hip osteoarthritis with a left total hip arthroplasty; right shoulder impingement treated surgically; left shoulder rotator cuff tear treated surgically; thoracic and lumbar spondylosis; and cervical degenerative disc disease.

The ALJ found that Plaintiff had the RFC to do light work limited to occasional climbing of ladders, ropes, and scaffolds; frequent climbing of ramps and stairs; frequent stooping, kneeling, crouching and crawling; frequent reaching to the front and side with his bilateral upper

extremities; and occasional reaching overhead with his bilateral upper extremities.

Based on the testimony of a vocational expert, the ALJ found that Plaintiff was able to do his past relevant work as a production supervisor (office) as generally and actually performed, and as a production supervisor of machines as generally performed.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

### 1. Evidentiary Hearings

Plaintiff was represented by an attorney at both hearings. (Tr. 32).

The first hearing was in July 2015. Plaintiff was fifty-four years old. He was injured in 2005 when a horse reared and fell back on him. He broke his lower back and crushed his pelvis. He was covered by health insurance through his wife's employment. (Tr. 36-38).

Plaintiff testified that he had not done any work for pay or profit since he was laid off from his last job. His last job was at Lee Enterprises. Other people were laid off at the same time. (Tr. 37-38, 41). Lee Enterprises owned the Post-Dispatch newspaper in St. Louis. After his accident, he was given an office job supervising the people who ran the machines. Before that, he was a production supervisor, which involved setting up the inserting machines and making sure they were working correctly. (Tr. 43-44).

Plaintiff and his wife had six horses. On a "good day," about once per month, plaintiff helped his wife feed the horses and was able to ride a horse on a trail for two hours. (Tr. 41-42.) He had both rotator cuffs repaired. He had 40 percent usage of his left arm but said he could not reach out in front of him. (Tr. 46-47.) He could lift about 20 pounds with his right arm, but nothing with his left. He could lift 25 pounds using both arms. (Tr. 50.) He had his left hip

4

replaced, which felt "a lot better" after rehab. He needed a right hip replacement. He could stand, sit, and walk for 20 to 30 minutes at a time. Plaintiff used a cane on bad days, which occurred around 3 times each week. On a bad day, his hip pain was so severe that he could not bend, stretch, or get down on his knees. He also had problems squatting, sitting in a chair, and standing. (Tr. 47-48.)

Plaintiff saw a psychiatrist for bipolar disorder and anxiety. During a manic bipolar episode, he became aggressive, angry, and destroyed his house. The episodes occurred eight times each year and lasted for about three days, followed by a day of resting in bed. (Tr. 52.) Plaintiff said his anxiety made him nervous around other people and his depression made him sleep for twelve hours a day. (Tr. 53-55).

At the second hearing in June 2018, Plaintiff testified that his hips were doing better but it was still hard for him to bend down, stretch, and pick up things. He could be up on his feet for about 30 minutes, and then developed pain in his low back, hips, and knees. He could walk for 20 minutes and sit for 20-25 minutes. His knee pain had only begun several months before the hearing. (Tr. 720-721).

Plaintiff used to own rental properties. The most he had at one time was 59. He gradually got rid of them because he could not physically take care of them and could not remember anything. In the last 3 years, he had about 15 properties. He stopped doing physical repairs on the properties about 3 years earlier. (Tr. 730-731). He would do jobs like power washing, cleaning the apartment for the next tenant, and painting. Back in 2011, he had 40 or 50 apartments. He spent an average of five hours a week working on the rental properties. (Tr. 740-741).

    2.    **Relevant Medical Records**

An MRI of Plaintiff's right shoulder in March 2012 showed mild changes of tendons

involving the supraspinatus tendon associated with tiny partial thickness intra-substance tear, and mild osteoarthritis. (Tr. 332-33.)

In April 2012, Plaintiff told primary care provider Dr. Vargo he had been experiencing anxiety, excessive worrying, insomnia, irritability, nervousness, and sleep disruption for three months. Dr. Vargo assessed bipolar disorder and prescribed Lamictal. Plaintiff was also prescribed Lortab for pain. (Tr. 306-07.)

Plaintiff saw Dr. Roland Barr, an orthopedic surgeon, in December 2012 for his right shoulder. He had been lifting hay bales eight months earlier and had significant pain in his shoulder "following this day's work." (Tr. 323-324). Dr. Barr performed right shoulder decompression surgery in January 2013, and Plaintiff began attending physical therapy immediately thereafter. (Tr. 266).

In February 2013, Plaintiff told Dr. Barr he was doing very well, but still had some pain in his right shoulder and was using a sling. He had 130 degrees of forward elevation, passively. There was no pain with general internal and external rotation, and he was neurovascularly intact. He was to return in four weeks. (Tr. 320). The next month, he was "doing well" with "minimal pain." (Tr. 318). In September 2013, Dr. Barr observed that Plaintiff "has done very well" and was "happy with his results." (Tr. 342).

In March 2013, Plaintiff saw primary care provider Dr. David O'Neill for low back and hip pain. (Tr. 357-358) X-rays of his left hip showed moderate left hip degenerative changes, deep acetabular cup and prominent bump of the femoral neck, and chronic fracture deformities of the anterior pelvis. X-rays of his right hip showed mild right hip degenerative changes and chronic fracture deformities of the anterior pelvis. (Tr. 353-56). Dr. O'Neill noted plaintiff was taking Vicodin. (Tr. 358).

In September 2013, Dr. Barr assessed posttraumatic osteoarthritis of the bilateral hips, with

significant disease. Dr. Barr recommended cortisone injections and suggested that Plaintiff "may well be a candidate for total hip arthroplasty in the near future," but he should put off surgery for as long as reasonably possible. (Tr. 342-343) Plaintiff received bilateral fluoroscopically guided hip joint steroid injections. (Tr. 601-602).

Plaintiff saw Dr. Barr in June 2014 for left shoulder pain which he said had been present for at least seven months and that he had not been able to lift his arm for about five months. Dr. Barr diagnosed a rotator cuff tear, which was confirmed by MRI. Dr. Barr performed a left shoulder arthroscopy with open rotator cuff repair in July 2014. (Tr. 585-588, 592).

In October 2014, Plaintiff reported to Dr. Barr that he felt like he was progressing but had limited range of motion of his left shoulder. On examination, his shoulder had 40 degrees of forward flexion and no pain with gentle internal/external rotation. He had excellent internal rotation. He had full passive range of motion and no tenderness to palpation. (Tr. 582). By November 2014, Plaintiff was reporting that he had no pain in his left shoulder but did have weakness, although he felt he was improving. His passive range of motion was "essentially full." His active range of motion was not even up to 90 degrees of abduction or forward flexion. He had normal active external rotation with no resistance as well as internal rotation to above the belt line. Dr. Barr planned for plaintiff to continue his rotator cuff strengthening. (Tr. 579).

At the October 2014 visit, Dr. Barr also addressed Plaintiff's left hip, which was stiff and painful with rotation. He had no internal rotation but good flexion and abduction. He was neurovascularly intact. Dr. Barr scheduled a total hip arthroplasty. (Tr. 582.)

The left hip arthroplasty was done in November 2014. (Tr. 565-567). At a follow up visit in December 2014, Plaintiff ambulated without any walking aides, was "doing great" with minimal pain, and had no new complaints or problems. On exam he had a minimal limp but no pain with rotation of his hip. He had good flexion and abduction and was neurovascularly intact.

Dr. Barr continued Plaintiff's Coumadin and Norco and planned to see Plaintiff in two months. Plaintiff was to continue with his strengthening exercises. (Tr. 570.)

Plaintiff did not return to Dr. Barr until October 2015. His left hip was doing very well with little pain. He was not using a walking aid, but he was struggling with his right hip. On exam, his gait was slightly antalgic. He had no pain on rotation of the left hip. He had some stiffness and pain in the right hip consistent with arthritis. He had good flexion and abduction and was neurovascularly intact. Plaintiff agreed to a total replacement of the right hip. (Tr. 1329).

Dr. Barr did a right hip arthroplasty in January 2016. (Tr. 1310). About three weeks later, Plaintiff told Dr. Barr he was doing well except for some soreness around his leg and into his thigh. On exam, he had no pain with rotation. Flexion was 90 degrees, abduction was 40 degrees, and he was neurovascularly intact. X-rays showed the arthroplasty was in good position with no evidence of problems. He could resume activity as tolerated, work on therapy on his own, and was to return in two months for a routine check of the hip. (Tr. 1333). Plaintiff did not return to Dr. Barr until November 2017, long after his date last insured, complaining of knee pain. (Tr. 1406).

Plaintiff saw his primary care provider for an annual exam in early January 2017. He was "doing ok." No complaints were noted, and no abnormal results were noted on exam. Plaintiff denied musculoskeletal and genitourinary symptoms. He was no longer taking Vicodin. (Tr. 1571-1572).

In July 2013, Fred Klug, Ph. D., performed a consultative psychological exam at the request of the agency. Plaintiff's attention span was adequate, immediate and short-term memory were impaired, long-term memory was intact, and new learning ability was good. Concentration was good. His intellectual functioning appeared low-average. (Tr. 336-340).

Plaintiff was seen at Southern Illinois Psychiatry for an initial assessment by a counselor in

8

August 2013. He said he had mood and anxiety symptoms for eight years that had become worse since he was laid off from his job two years earlier. On exam, he was cooperative with no psychotic features. He was able to stay focused. The counselor noted that, although his cognition, including memory, abstraction, and reasoning, was grossly intact and at baseline, Plaintiff and his wife "reported that he is very forgetful." At every visit through September 2014, providers at this office noted he was able to stay focused and his cognition, including memory, abstraction, and reasoning, was grossly intact and at baseline. (Tr. 404-421, 435-443).

Plaintiff changed to Shawnee Health Services for mental health treatment in February 2015. He had been dropped by Southern Illinois Psychiatry because he took Xanax that had not been prescribed for him. At every visit through December 2016, his cognition was always noted to be within normal limits. (Tr. 1530-1548). In March 2017, mental status exam was normal, with normal attention and concentration ability. His intelligence was rated as above average. (Tr. 1507). Similar findings were noted in June and September 2017. (Tr. 1503-1504). In December 2017, a year after his date last insured, he complained of being forgetful. (Tr. 1500). He was noted to have impaired concentration, attention, and memory in March 2018. (Tr. 1497).

A neuropsychological assessment was done in July 2018. Plaintiff reported poor memory dating from an automobile accident in October 2015. He said he drove off the road and flipped his car twice, was airlifted to a trauma center, and was treated and released the same day. As part of the assessment he was given an IQ test. His overall IQ score was 77, in the mildly impaired range. (Tr. 1631-1837).

    **3.**     **State Agency Consultants' Opinions**

In July 2013 and February 2014, two state agency consultants assessed Plaintiff's physical RFC based on a review of the record. The first concluded that Plaintiff could do medium work with some physical limitations. (Tr. 77-78). The second, Dr. Hinchen, concluded he could do

9

light work with some physical limitations. (Tr. 90-91). Two other consultants assessed Plaintiff's mental RFC. Both considered Dr. Klug's examination as well as the other records obtained as of the time of their review and concluded that Plaintiff had no severe mental impairments. (Tr. 75-76, 88-89).

## Analysis

Plaintiff was insured for DIB only through December 31, 2016. Therefore, he must demonstrate that he was disabled as of that date. *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

For his first point, Plaintiff challenges the ALJ's evaluation of his statements concerning the intensity, persistence, and limiting effects of his symptoms. Plaintiff complains that the ALJ did not explain his conclusions that Plaintiff's surgical history does not support the contention that his impairments preclude all work and that the objective medical evidence and treatment history are only somewhat consistent with his subjective allegations.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

As Plaintiff concedes, the ALJ "summarized a lot of the medical evidence." (Doc. 21, p. 6). Plaintiff does not point to any significant medical evidence during the relevant period that was ignored by the ALJ. The ALJ's decision must be read as a whole and be given a commonsensical

10

reading rather than nitpicking. *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015); *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). The ALJ's discussion of the medical evidence makes it clear that the ALJ concluded that plaintiff's surgeries were successful as demonstrated by his statements to Dr. Barr and by the doctor's exams. Therefore, the ALJ reasonably concluded that Plaintiff's claims of disabling pain after successful surgeries were not credible.

Plaintiff's argument relies on a highly selective view of the medical evidence. He stresses the positive findings on exam and MRI studies before his surgeries, without acknowledging the excellent surgical results. (Doc. 21, pp. 5-7). Notably, Plaintiff does not argue that the ALJ erred in not awarding him a closed period of disability. Rather, he argues that the record compels a finding that he is disabled even after his surgeries. However, the ALJ fairly summarized the medical records, and, when the records are considered in their entirety, they support the ALJ's conclusion that the course of treatment was successful and Plaintiff recovered well enough to enable him to do a range of work.

Plaintiff faults the ALJ's consideration of his daily activities. He argues, "At his 2018 hearing the decision says he testified he was able to do things on his rental properties that he said he would have been unable to do at his prior hearing indicating his prior testimony was unreliable. (Tr. 705) This statement is left unexplained and unsupported by the evidence." (Doc. 21, p. 7). Here again, Plaintiff fails to give the decision a commonsensical reading. The ALJ was obviously referring to Plaintiff's testimony at the second hearing about working on his rental properties. At the first hearing, Plaintiff testified that he had not done any work for pay or profit since he was laid off from his last job. However, at the second hearing in June 2018, he testified that he had worked on his numerous rental properties and that he had 40 or 50 apartments in 2011, the year he claims he became disabled. He said he stopped doing physical repairs on the properties about 3 years before the hearing, i.e., around 2015. The ALJ could reasonably conclude that this testimony

conflicted with his testimony at the first hearing and contradicted his claim that he had been totally disabled since April 2011.

Plaintiff ignores the reasons the ALJ gave for his assessment of Plaintiff's subjective statements. The ALJ explained that the objective evidence, including results of doctors' exams, contradicted his claims, as did his own statements to Dr. Barr that he was happy with the surgical results. He noted that Plaintiff discharged himself early from physical therapy after his left shoulder surgery and his left hip replacement, and did not return to Dr. Barr for almost a year after the first follow-up visit after the left hip replacement. Further, he attended only one follow up visit after the right hip replacement and did not see Dr. Barr at all from February 2016 to November 2017, long after his date last insured. (Tr. 701-705). All of this, together with his conflicting testimony about working on his rental properties and the fact that he was laid off from his job as part of a downsizing at the company, provides substantial support for the ALJ's assessment.

Plaintiff's second point is that the ALJ should have found that he had a severe mental impairment at step 2 of the sequential analysis.

At step 2, the ALJ must determine whether the claimant has one or more severe impairments. This is only a "threshold issue," and, as long as the ALJ finds at least one severe impairment, he must continue on with the analysis. And, at step 4, he must consider the combined effect of all impairments, severe and non-severe. Therefore, a failure to designate a particular impairment as "severe" at step 2 does not matter to the outcome of the case as long as the ALJ finds that the claimant has at least one severe impairment. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012), citing *Castile v. Astrue*, 617 F.3d 923, 927-928 (7th Cir. 2010). Plaintiff does not identify any specific mental limitation that he argues should have been accounted for in the RFC assessment.

12

Plaintiff's argument here focuses on the 2018 neuropsychological assessment. He neglects to mention that the ALJ considered that assessment but found it to be of little relevance because it occurred long after the date last insured and because the clinical findings supporting the assessment were not present during the insured period. The ALJ had earlier summarized the mental health treatment and noted that mental status exams during the insured period were generally unremarkable. He also pointed out that the 2018 assessment was premised on a history given by Plaintiff in which he said his memory problems had started years earlier after a car accident, but there was no mention of a car accident in the evidence. (Tr. 695-698).

Plaintiff has the burden of demonstrating he was disabled as of his date last insured. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987). And, as Plaintiff was represented by counsel at the agency level, the ALJ was entitled to assume that he put on his best case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). The ALJ could therefore presume that if Plaintiff's mental and cognitive problems were caused or exacerbated by a car accident within the insured period, Plaintiff would have presented evidence of that accident.

For his final point, Plaintiff argues that the RFC assessment was not supported by substantial evidence.

He first argues that the RFC assessment was not based on a medical opinion. However, the determination of RFC is an administrative finding that is reserved to the Commissioner. 20 C.F.R. §404.1527(d)(2). The ALJ was not required to base his RFC assessment on a medical opinion. The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions. . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).

Plaintiff argues that the ALJ failed to adequately consider Dr. Klug's report of the consultative psychological exam. The ALJ did refer to that exam in discussing Plaintiff's mental

13

functioning at Tr. 696-697. And, Dr. Klug's report was considered by the two state agency consultants who concluded that Plaintiff had no severe mental impairments. He also argues that the ALJ did not explain why he found urethral stricture with urinary incontinence to be a nonsevere impairment, but, again, the designation of severe impairments at step 2 is only a threshold issue and Plaintiff does not identify any work-related limitations arising out of this condition.

Plaintiff's RFC argument is premised on the idea that the evidence did not demonstrate that he is capable of light exertion work, focusing on the requirement for six hours of standing/walking. (Doc. 19, p. 14). He ignores the ALJ's finding that he was capable of doing his past relevant work as a production supervisor (office), which is generally performed at the sedentary level. (Tr. 705-706). Plaintiff does not argue that the evidence fails to support a finding that he was capable of sedentary work.

In the end, Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. He has not identified any error requiring remand. Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATE:   July 13, 2020.**

*s/ Reona J. Daly*
**REONA J. DALY**
**U.S. MAGISTRATE JUDGE**

15